NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

Bobbie Lynn Pierce
                        :
         Plaintiff,           Hon. Joseph H. Rodriguez
                        :
      v.                   Civil Action No. 09-6487
                        :
Cherry Hill Township, et. al.,      **Opinion**
                        :
         Defendants.
_____ :

      This matter is before the Court by way of Defendants' Motion for Summary

Judgment pursuant to Fed. R. Civ. P. 56(c) [Dkt. 43]. For the reasons described herein,

the Court will deny Defendants' Motion.

## <u>Background</u>

      This case arises from events that transpired starting at approximately 3:00 a.m.

on November 22, 2007, when a group of men attacked Mr. and Mrs. Pierce in the

parking lot of the Cherry Hill Diner. (Defs.' Statement of Material Facts Not in Dispute

"SMF" ¶¶ 8-20.) Mr. and Mrs. Pierce went to the Diner with their friends after spending

an evening out together. (Defs.' SMF ¶¶ 1-8.) As they pulled into the parking lot of the

Diner, a van almost collided into Mr. Pierce's Ford Bronco. (Defs.' SMF ¶ 9.) The

people in the van and the people in Mr. Pierce's Bronco yelled at each other and

exchanged curses; one of the men from the van exited the vehicle, approached Mr.

Pierce's Bronco, and punched the driver's side window. (Defs.' SMF ¶¶ 10-11.) Mr.

Pierce got out of the Bronco and began to argue with the man while Mrs. Pierce went

behind the wheel of the Bronco and pulled the vehicle into a space in the Diner parking lot.  (Defs.' SMF ¶¶ 12-14.)

The man arguing with Mr. Pierce then punched Mrs. Pierce near her left ear before ripping her purse out of her hands and throwing it onto Route 38.  (Defs.' SMF ¶¶ 15-16.)  As Mrs. Pierce and her friend left the scene to retrieve her purse, Mr. Pierce and the man began to fight.  (Defs.' SMF ¶¶ 17-18.)  When she returned to the parking lot, Mrs. Pierce saw Mr. Pierce laying on the top steps of the entrance of the diner and three men standing over him kicking his head.  (Defs.' SMF ¶¶ 19, 30.)  Mrs. Pierce saw her other friend trying to protect Mr. Pierce by laying on top of his head.  (Defs.' SMF ¶ 19.)  The men eventually stopped kicking Mr. Pierce and Mrs. Pierce's friend stood up.  (Defs.' SMF ¶¶ 20-21.)  Mr. Pierce did not seem himself; he was very blank and pale, bleeding from his nose and ear, sweating profusely, and he was unable to speak.  (Defs.' SMF ¶¶ 21-26.)  Mr. Pierce was unable to get up and did not respond when Mrs. Pierce asked him, "Joe, are you okay?"  (Defs.' SMF ¶¶ 27-28.)

Meanwhile, Cherry Hill Police Department Sergeant Thomas Weber was driving home in his personal vehicle following his shift when he got a Code 2 call about a physical altercation in the parking lot of the Cherry Hill Diner.  (Defs.' SMF ¶¶ 35, 38.)  Code 2 calls indicate that the situation is serious and requires sirens and lights.  (Defs.' SMF ¶¶ 38.)  Sergeant Weber testified that his first observation of Mr. Pierce was that he was on his knees at the top step of the entrance to the Diner.  (Defs.' SMF ¶¶ 39.)  Sergeant Weber learned that there had been a stabbing and that Mr. Pierce was a "strong suspect" in the stabbing.  (Pl.'s Br. Opp'n., Ex. E, "Weber Dep," Tr. at 26:14 – 26:22.)  Sergeant Weber testified that Mr. Pierce was holding a closed folding knife,

which he took from him without any resistance as he patted down Mr. Pierce.[1]  (Defs.'  SMF ¶¶ 43-47.)  Sergeant Weber asked Mr. Pierce his name and what happened; Mr. Pierce did not respond and muttered incomprehensibly.  (Defs.' SMF ¶¶ 40-42, 55.)

By this time, Sergeant Brittian Henderson, Patrolman Evan Triveri, Patrolman Ryan Del Campo, and other officers had arrived at the diner.  (Defs.' SMF ¶¶ 57-58, 66-69, 78-80.)  After they arrived, Officers Triveri and Del Campo approached the scene.  (Defs.' Mot. Summ. J., Ex. D, "Del Campo Dep." Tr. at 22-25; Pl.s' Br. Opp'n., Ex. J, "Weber Supplementary Offense Report," at DEF 0022.)  Mr. Pierce was lying on the ground and Sergeant Weber was confronting Mrs. Pierce and her two friends.  (Defs.' Mot. Summ. J., Ex. D, "Del Campo Dep." Tr. at 22-25; Pl.s' Br. Opp'n., Ex. J, "Weber Supplementary Offense Report," at DEF 0022.)  Mrs. Pierce stated that during this time, she "explained to the Police Officer that my husband had been kicked and beaten in the head."  (Pl.'s Br. Opp'n., Ex. N, "Certification of Bobbie Lynn Pierce" at ¶ 4.)  Sergeant Weber testified that the women were all trying to speak to him at once and they all appeared to be intoxicated.  (Pl.'s Br. Opp'n., Ex. E, "Weber Dep," Tr. at 81:12 – 81:21)  He reported that "the females became belligerent towards me as I asked them to get off the steps.  The females did not comply and it became necessary to employ physical force to move them away from my person and to physically escort them down the stairs to the sidewalk."  (Pl.s' Br. Opp'n., Ex. J, "Weber Supplementary Offense Report," at DEF 0022.)  Sergeant Weber testified that "it is possible that" Mrs. Pierce told him that Mr. Pierce had been kicked in the head.  (Pl.'s Br. Opp'n., Ex. E, "Weber Dep," Tr. at 78:19 – 83:01.)

---

[1] Mrs. Pierce indicated that she did not see a knife (Pl.'s Resp. Defs.' SMF ¶ 43); however, it is undisputed that Mr. Pierce was carrying a knife that night as he "always" does.  (Defs.' SMF ¶ 32).

Sergeant Weber instructed Officers Triveri and Del Campo to arrest Mr. Pierce and put him in the back of Officer Triveri's police car.[2]  (Pl.'s Opp'n. Defs.' Mot. Summ. J., Ex. J, "Triveri Supplementary Offense Reoprt," at DEF 0012, "Weber Supplementary Offense Report," at DEF 0023.)  The record indicates that during this time, either or both Officers Triveri and Del Campo communicated with Mr. Pierce by asking "Sir, you alright?" and "Sir, are you injured?"  (Triveri MVR at 3:28:15 - 3:28:48.)

At approximately 3:42 a.m., the officers assisted Mr. Pierce into Officer Triveri's patrol car.  (Triveri MVR at 3:41:30 - 3:42:05.)  Officer Triveri's MVR video displays the Officers telling Mr. Pierce "one step at a time, I got you" and "watch your head."  (Triveri MVR at 3:41:30 - 3:42:38.)  Officer Renee Houlihan reported arriving at the diner at this time and observing "a male prisoner in the rear seat [of Triveri's car]" who "was obviously intoxicated" and "could not keep his eyes open and had his head bent back."  (Pl.'s Br. Opp'n., Ex. J, "Houlihan Supplementary Offense Report.")  The video indicates that while Mr. Pierce was sitting in the back of the car, the officers were talking about the fight, asking "who's this guy, what's his role" and noting that "his face is all swelled up" and "he has a really good cut on him."  (Triveri MVR at 3:43:10 - 3:45:00.)  The video shows Mr. Pierce sitting upright in Triveri's car while the officers have a conversation for some time.  (Triveri MVR at 3:42:05 - 3:52:00.)  During this conversation, the officers discuss "road rage" and one officer says that people were "kicking the shit out of this guy."  (Triveri MVR at 3:46:54 - 3:47:30.)  At 3:50 a.m., an

---

[2] Sergeant Weber testified that he took Mr. Pierce down the steps, placed him in handcuffs, and put Mr. Pierce in the back of Officer Triveri's car.  (Defs.' Mot. Summ. J., Ex. 3, Ragonese Decl., Ex. B, "Deposition of Thomas Weber," (hereinafter "Weber Dep."), Tr. 25:15 – 26:01)  However, both Sergeant Weber and Officer Triveri's Offense Reports indicate that Sergeant Weber instructed Officer Triveri to  walk Mr. Pierce to Officer Triveri's car.  Plaintiff also contends that Officer Triveri walked Mr. Pierce to Officer Triveri's car.  (Pl.'s Resp. Defs.' SMF ¶ 49.)

officer shined a light into the car, and, directing the light at Mr. Pierce, said "somebody got kicked in the head a few times." (Triveri MVR at 3:50:40 - 3:51:08.)

Sergeant Henderson testified that he observed Officers Triveri and Del Campo transport Mr. Pierce to Officer Triveri's cruiser and "from my observations, I knew he was highly either intoxicated or that drugs may be involved" and "he wasn't normal." (Defs.' Mot. Summ. J., Ex. C, "Henderson Dep," Tr. 15:17 – 17:20.) Sergeant Henderson testified that he does not recall being told that there was an allegation that Mr. Pierce had been kicked in the head. (Defs.' Mot. Summ. J., Ex. C, "Henderson Dep," Tr. 19:20 – 19:24.) Sergeant Henderson testified that "knowing there was a good chance that he was probably going to end up being incarcerated, being sent to the county jail, with the observations that I saw of [Mr. Pierce], that I was going to need to have him medically cleared in order for him to be incarcerated." (Defs.' Mot. Summ. J., Ex. C, "Henderson Dep," Tr. 15:21 – 16:03.) Sergeant Henderson testified that if an individual is going to be incarcerated in the county jail and "there is the remote possibility that there may be something wrong with the individual, before he gets incarcerated, they have to be medically cleared," but that if he "would not have been going to the county jail, I probably would not have sent him to the hospital" because individuals do not have to be medically cleared to be housed in a holding cell. (Defs.' Mot. Summ. J., Ex. C, "Henderson Dep," Tr. 15:17 – 17:03.) Sergeant Henderson testified that he accordingly instructed Officer Triveri to take Mr. Pierce to the hospital for medical clearance.[3] (Defs.' Mot. Summ. J., Ex. C, "Henderson Dep," Tr. 15:17 – 16:19.)

---

[3] Defendants maintain that Officer Henderson instructed Patrolman Triveri to take Mr. Pierce to the hospital for medical clearance (Defs. SMF ¶ 60), yet Plaintiff points out that in her Internal Affairs interview, Officer Houlihan stated that Seargent Weber instructed Officer Triveri to transport Mr. Pierce. (Pl.'s Resp. Defs.' SMF ¶ 60).

At approximately 3:52 a.m., the officers began to drive Mr. Pierce to the hospital. (Triveri MVR at 3:52:00.)  Plaintiff's expert points out that the MVR indicates that during this time, Mr. Pierce rode in handcuffs in the back of the car, "his head bouncing around, not supported, down to his chin."  (Pl.'s Opp'n. Ex. C, "Jason Report"; Triveri MVR at 3:52:00 - 3:55:20.)  They arrived at the hospital at approximately 3:55 a.m. and told Mr. Pierce that he needed to be "checked out."  (Triveri MVR at 3:55:00.)  The video shows Mr. Pierce grunting or moaning while he slowly maneuvers himself out of the back seat of the car.  (Triveri MVR at 3:55:20 - 3:55:45.)

The video indicates that an officer told the triage nurse that "he got kicked in the head a couple times, we're really not sure other than that."  (Triveri MVR at 3:58:10 - 3:58:20.)  An Officer told Mr. Pierce "don't fall forward" (Triveri MVR at 4:00:20) and an officer told Mr. Pierce that if he has an injury that they don't know about, "pick up your feet."  (Triveri MVR at 4:01:50.)  Mr. Pierce vomited while in triage.  (Triveri MVR at 4:02:30; Pl.'s Opp'n., Ex. L, "Nursing Initial Assessment Record.")  The nurse's initial assessment records completed at this time indicate that Mr. Pierce "arrived via police, states he was in an altercation and may have been kicked in the head" and that he "attempted to get up and out of chair, will not answer questions."  (Pl.'s Opp'n., Ex. L, "Nursing Initial Assessment Record.")

At approximately 4:10 a.m., Mr. Pierce was transported to the emergency room and the hospital called a "code blue" at 4:30 a.m.  (Pl.'s Opp'n., Ex. L, "Nursing Initial Assessment Record"; Defs.' Mot. Summ. J., Ex. J, "Code Blue Report Sheet.")  At approximately 4:45 a.m., Mr. Pierce was pronounced dead.  (Defs.' Mot. Summ. J., Ex. K, "Mortality Report Form.")  An autopsy conducted between 9:00 a.m. and 11:00 a.m. later that morning describes Mr. Pierce's cause of death as "atherosclerotic and

hypertensive cardiovascular disease" and the manner of death as "natural." (Defs.' Mot. Summ. J., Ex. L, "Autopsy Report.") Plaintiff's medical expert, Dr. Donald Jason, a forensic pathologist, prepared a report that summarizes four possible causes of death and indicates his opinion that Mr. Pierce died because of "[m]ultiple blows to the head by stomping causing concussion and cerebral edema leading to cerebral hypoxia shock and sudden ventricular fibrillation and death."[4] (Pl.'s Br. Opp'n., Ex. C, "Jason Report.")

Radio calls between the officers following Mr. Pierce's death revealed a conversation between who Plaintiff identifies as Officer Triveri and Sergeant Henderson, during which Officer Triveri stated, "to add to this, the actor has coded . . ." (Pl.'s Br, Opp'n., Ex. O, Track 55.) Sergeant Henderson responded, "Please advise Detective Kelly that you are initially stating here that the injuries . . . are the result of his present condition . . . and that he apparently suffered some bruises in the fight." (Pl.'s Br, Opp'n., Ex. O, Track 58.) Officer Triveri responded, "alright it's not the result of the fight it's a result of the alcohol and everything?" (Pl.'s Br, Opp'n., Ex. O, Track 58.) Sergeant Henderson then asked, "do you have your cell phone with you?" (Pl.'s Br, Opp'n., Ex. O, Track 58), which Plaintiff contends indicates that Officer Triveri was instructed to speak with Sergeant Henderson on his unrecorded and unmonitored cell phone. (Pl.'s Br. Opp'n. 4; Pl.'s Resp. Defs.' SMF ¶ 176.)

On November 23, 2009 Mrs. Pierce initiated this action against Cherry Hill Township, the Cherry Hill Township Police Department, and several individual Officers

---

[4] Dr. Jason identified the following three other possible causes of death: (1) occlusive coronary arteriosclerosis leading to sudden ventricular fibrillation and death; (2) hypertensive cardiac disease leading to sudden ventricular fibrillation and death; (3) asphyxia due to injury and swelling of the upper airway as evidenced by the hyoid bone fracture leading to cerebral hypoxia leading to sudden ventricular fibrillation and death. (Pl.'s Br. Opp'n., Ex. C, "Jason Report.")

in New Jersey Superior Court, Camden County, alleging both state and federal constitutional claims as well as state tort claims. Defendants properly removed this action on December 24, 2009. Following removal, Defendants successfully moved this Court to dismiss Mrs. Pierce's Eighth Amendment "cruel and unusual punishment" claim. The Court heard oral argument on the present summary judgment motion on April 11, 2013, during which Mrs. Pierce conceded several of her claims against various defendants.

The essence of Mrs. Pierce's remaining claims, and the basis of the instant summary judgment motion, concerns Plaintiff's claims under 42 U.S.C. § 1983, through which she asserts that the individual officers who interacted with Mr. Pierce violated Mr. Pierce's right to "prompt medical treatment" as guaranteed by the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution under the theory that the Cherry Hill Police, "instead of bringing the injured Mr. Pierce for immediate medical attention that she requested on his behalf or summoning medical attention to the scene, handcuffed him and placed him in police custody in the back of a patrol car, handcuffed, for approximately thirty (30) minutes at the scene." (Pl.'s Br. Opp'n. 2.) Defendants seek summary judgment on Plaintiff's remaining federal § 1983 claims and analogous state constitutional claims. Defendants argue that they are entitled to qualified immunity for these claims and additionally assert that they are entitled to good faith immunity on Mrs. Pierce's tort claims under the New Jersey Tort Claims Act. Additionally, Defendants contend that they are entitled to summary judgment because Mrs. Pierce cannot sustain a claim for negligent infliction of emotional distress.

For the reasons described herein, the Court will deny Defendants' motion for summary judgment.

## Jurisdiction

The Court has jurisdiction over Mrs. Pierce's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Mrs. Pierce's state law claims pursuant to 28 U.S.C. § 1367.

## Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### Plaintiff's Medical Care Claims and Qualified Immunity

As an initial matter, the Court notes that Mrs. Pierce's federal constitutional claims are brought under 42 U.S.C. § 1983 , which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and

> laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. As the statute illustrates, Section 1983 does not, by itself, create

substantive rights, but instead provides a civil remedy against any person who, under

color of state law, deprives another of rights protected by the United States Constitution

or created by other federal laws. See Collins v. City of Harker Heights, 503 U.S. 115, 120

(1992). Accordingly, to state a cognizable claim under Section 1983, a plaintiff must

allege a "deprivation of a constitutional right and that the constitutional deprivation was

caused by a person acting under the color of state law." Phillips v. County of Allegheny,

515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Teder, 95 F.3d 1199, 1204 (3d Cir.

1996)). Thus, a plaintiff must demonstrate two essential elements to maintain a claim

under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the

Constitution or the laws of the United States" and (2) that plaintiff was deprived of her

rights by a person acting under the color of state law. Williams v. Borough of West

Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

Defendants assert that they are entitled to qualified immunity on Mrs. Pierce's

constitutional claims. The doctrine of qualified immunity "protects government officials

from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565

(2009) (internal citation omitted). This doctrine "balances two important interests—the

need to hold public officials accountable when they exercise power irresponsibly and the

need to shield officials from harassment, distraction, and liability when they perform

their duties reasonably" and it "applies regardless of whether the government official's

error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.  Id.  (internal quotation omitted).  The qualified immunity inquiry presents a two-prong analysis, which requires the Court to assess whether, viewing the record in the light most favorable to the Plaintiff, the facts alleged show that the officers' conduct violated a constitutional right.  See Bayer v. Monroe Cnty. Children & Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009) (internal citation omitted).  Additionally, the Court must "determine whether the constitutional or statutory right allegedly violated by the defendant was 'clearly established.'"  Id.  Though no longer mandated in this order, the Court will first assess whether the facts alleged show that the officers' conduct violated a constitutional right before turning to whether this right was "clearly established."  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009) (citing Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (noting that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory" and "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The essence of Plaintiff's constitutional claim is that the police officers unlawfully denied or delayed medical care to Mr. Pierce by failing to call emergency medical services or failing to timely and properly transport Mr. Pierce to the hospital. Defendants urge the Court to follow Groman v. Twp. of Manalapan, in which the United States Court of Appeals for the Third Circuit stated that "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious

medical needs." <u>Groman v. Twp. of Manalapan</u>, 47 F.3d 628, 637 (3d Cir. 1995) (citing

<u>Walmsley v. City of Phila.</u>, 872 F.2d 546, 551-52 (3d Cir. 1989).[5]  Defendants point out

that following <u>Groman</u>, courts in the Third Circuit have applied this "deliberate

indifference" standard to claims of police failure to provide medical care to arrestees

and other pre-trial detainee in police custody.[6]  Accordingly, Defendants argue that this

"deliberate indifference" standard also applies to Mrs. Pierce's claims regarding the

alleged denial or delay of medical care.  (Defs.' Br. Sup. Mot. Summ. J. 8.)

In contrast, Mrs. Pierce has vigorously asserted that her claims are properly

analyzed under the Fourth Amendment's "objective reasonableness" inquiry rather than

a "deliberate indifference" standard.[7]  Here, Mrs. Pierce contends that <u>Groman</u> does not

---

[5] In <u>Groman</u>, police and first aid personnel responded to a call to Mr. Groman's residence after he apparently suffered a stroke.  <u>Groman v. Twp. of Manalapan</u>, 47 F.3d 628, 632 (3d Cir. 1995). Mr. Groman allegedly resisted police assistance and first aid responders eventually left the scene.  <u>Id.</u>  Subsequently, Mr. Groman engaged in a physical altercation with the police, ultimately leading to Mr. Groman's arrest.  <u>Id.</u>  He contended that the police dragged him, jumped on him, and otherwise physically hurt him, resulting in black eyes and other bodily injury.  <u>Id.</u>  at 632-33.  Mr. Groman was taken to the police station where he again refused medical treatment.  <u>Id.</u>  In his lawsuit, Mr. Groman alleged, among other things, that law enforcement failed to provide necessary medical treatment throughout the course of this incident.  <u>Id.</u>  at 637.  The Third Circuit upheld the district court's grant of summary judgment in favor of Defendants on this claim, reasoning that the record "clearly establish[ed] that the police offered [the plaintiff] medical assistance which he consistently and obstinately rejected" and the defendants were therefore not deliberately indifferent.  <u>Id.</u>

[6] To succeed under the "deliberate indifference" standard, the plaintiff must prove:  (1) that his medical needs were "objectively serious" and (2) that the defendants exhibited "deliberate indifference" to Plaintiff's medical needs.  <u>Monmouth County Correctional Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 346 (3d Cir. 1987) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).  A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention" or "where the denial of treatment would result in the unnecessary and wanton infliction of pain or a life-long handicap or permanent loss." <u>Atkinson v. Taylor</u>, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal citations omitted).

[7] Mrs. Pierce points out that she has chosen to argue her claims under the Fourth Amendment's "reasonableness" standard throughout this litigation.  Here, she notes that to support the Third Circuit's application of the Eighth Amendment's "deliberate indifference" standard to the medical care claims of individuals "in custody" in <u>Groman</u>, the Third Circuit relied on <u>Walmsley v. City of Philadelphia</u>, 872 F.2d 546 (3d Cir. 1989).  <u>Groman v. Twp. of Manalapan</u>, 47 F.3d

resolve the issue before the Court because the Eighth Amendment's "deliberate indifference" standard, applied to the arrestee's claims in <u>Groman</u> through the Fourteenth Amendment, reflects the minimum amount of protection afforded to an individual prior to conviction and sentencing. See, e.g., City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting that "the due process rights of a person [who was injured while being apprehended by the police] are at least as great as the Eighth Amendment protections available to a convicted prisoner"); <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976) (concluding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment" and thus "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983"). Mrs. Pierce thus contends that the Third Circuit has not explicitly discussed how much more protection should be afforded to individuals' medical care claims that arise prior to conviction and sentence. (Pl.'s Br. Opp'n. 7-14.) Specifically, Mrs. Pierce points out that when articulating that a

---

628, 636 (3d Cir. 1995) (citing <u>Walmsley v. City of Phila.</u>, 872 F.2d 546, 551–52 (3d Cir.), <u>cert. denied</u>, 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976))). Mrs. Pierce emphasizes that the <u>Walmsley</u> Court applied the "deliberate indifference" standard based upon the plaintiff's own allegations in that case that the defendants were deliberately indifferent; here, in contrast, Mrs. Pierce stresses that she has maintained that her claims should be viewed under the Fourth Amendment's "objective reasonableness" standard because they arise out of Mr. Pierce's arrest. See <u>Walmsley</u>, 872 F.2d at 551 (noting that "[the plaintiff] contends that [the individual officers] were deliberately indifferent to Thomas Walmsley's serious medical needs, and therefore deprived him of his civil rights"). Here, the general Fourth Amendment inquiry looks at whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, "without regard to their underlying intent or motivation" and it requires courts to keep in mind that "reasonableness" must "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. <u>Graham v. Connor</u>, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989) (internal citations omitted). <u>See also</u> <u>Davis v. Twp. of Paulsboro</u>, 421 F. Supp. 2d 835, 854 (D.N.J. 2006) (applying Fourth Amendment's "reasonableness" inquiry to medical care claims arising during course of arrest).

"deliberate indifference" standard applies to medical care claims of individuals "in custody," the Third Circuit did not explain the meaning of the term "custody" and, accordingly, district courts have applied the "deliberate indifference" standard to medical claims arising at various and oftentimes distant points along the "custodial" continuum.[8]  See, e.g., Hill v. Algor, 85 F. Supp. 2d 391 (D.N.J. 2000) (Brotman, J.)

---

[8] In particular, courts seem to recognize that while Eighth Amendment applies only to convicted prisoners after the prisoner has been sentenced, arrestees and other pretrial detainees are entitled to no less protection than a convicted prisoner is entitled to under the Eighth Amendment.  See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 584 (3d Cir. 2004); Cnty. of Sacramento v. Lewis, 523 U.S. 833, 850, 118 S. Ct. 1708, 1718, 140 L. Ed. 2d 1043 (1998) ("Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial.")  Accordingly, under the Fourteenth Amendment's Due Process Clause, courts in this Circuit have borrowed the Eight Amendment's "deliberate indifference" standard when assessing medical care claims of "pretrial detainees" at various chronological points along the continuum of the police detention environment.  See, e.g., Mayo v. Cnty. of York, Civ. No. 10-01869, 2012 WL 7827997, at *4-5 (M.D. Pa. Nov. 6, 2012) report and recommendation adopted, 10-1869, 2013 WL 1327204 (M.D. Pa. Mar. 29, 2013) (applying "deliberate indifference" standard to pretrial detainee's claims arising during his detention at York County Prison after noting that the Third Circuit has not determined the amount of protection afforded to a pretrial detainee above the protection provided to a convicted prisoner under the Eighth Amendment, yet recognizing that this protection is at least as great as the Eighth Amendment standard); Hinton v. White, Civ. No. 10-3902, 2012 WL 6089476, at *6 (D.N.J. Dec. 6, 2012) (applying "deliberate indifference" standard to claims arising from incident where Mr. Hinton was struck with police car and then handcuffed while officer searched for drugs, and finding that police did not act with "deliberate indifference" when, after attempting to search Mr. Hinton's person, police called ambulance in response to Mr. Hinton's screams); Gunter v. Twp. of Lumberton, Civ. No. 07-4839, 2012 WL 2522883 (D.N.J. June 29, 2012) (applying "deliberate indifference" standard to medical care claims arising from physical altercation with police at decedent-arrestee's nephew's home and finding that officer defendants "discharged their burden as the party seeking summary judgment on a deliberate indifference claim by pointing out the absence of evidence to support Plaintiff's claim that there was any delay in responding to [the arrestee's] medical needs"); Marshall v. Penn Twp., Civ. No. 08-90, 2009 WL 3241873, at *9 (W.D. Pa. Oct. 6, 2009) ("noting that "[n]either the Court of Appeals for the Third Circuit nor the Supreme Court has drawn the precise contours of the standard applicable to a pretrial detainee's Fourteenth Amendment claims relating to medical care[, and] [t]o date, the Court of Appeals has applied the Eighth Amendment standard to these claims").  Defendants also direct the Court to an unpublished Third Circuit opinion, in which the Third Circuit addressed the plaintiff's claim that "the Police Department and former police chief . . . deliberately delayed obtaining medical treatment for him for two hours after [a] gun battle ended."  Jennings v. Fetterman, 197 Fed. Appx. 162, 165 (3d Cir. 2006).  There, the Third Circuit noted that "[a]s an arrestee in the custody of government officials, [Plaintiff] was required to be given medical care for his wounds" and

(noting that in <u>Groman</u>, the Third Circuit "did not define 'custody' nor otherwise indicate where along the custodial continuum the deliberate indifference standard applies").[9]  Accordingly, Mrs. Pierce challenges Defendants' assertion that the "deliberate indifference" standard should govern her claims, particularly when her claims, which appear to stem from the officers' initial interactions with Mr. Pierce on the steps of the diner, do not seem rooted in a situation that resembles a "custodial" environment; rather, Mrs. Pierce contends that she is questioning the "objective reasonableness" of Mr. Pierce's arrest by challenging the officers' failure to respond to Mr. Pierce's medical needs leading up to and during the course of Mr. Pierce's arrest.[10]

---

"[d]enial or delay of such care can constitute deliberate indifference to a serious medical need, as proscribed by the Eighth and Fourteenth Amendments."  <u>Id.</u>  (internal quotation omitted).

[9] In <u>Hill v. Algor</u>, the plaintiff's claims arose from conduct that allegedly occurred when he was arrested and transported to the State Police Barracks, placed in a holding cell, and handcuffed to a bench from approximately 11:45 p.m. until 2:30 a.m.  <u>Hill v. Algor</u>, 85 F. Supp. 2d 391, 395 (D.N.J. 2000).  During this time, Mr. Hill was allegedly beaten by a group of state troopers.  <u>Id.</u>  At approximately 2:45 a.m., when Mr. Hill was moved to an interrogation room, an Investigator noticed some blood on his clothing, hands, and head.  <u>Id.</u>  Mr. Hill was in the interrogation room until he was released sometime after 4:30 a.m.  <u>Id.</u>  He sought medical treatment from Cooper Hospital, where he received stitches in his head.  <u>Id.</u>  Mr. Hill also complained of spinal and knee injuries as a result of the assault.  <u>Id.</u>  Judge Brotman expressed concern with applying the "deliberate indifference" standard to these facts, but noted that "the standard has been applied to § 1983 medical care claims arising out of one's arrest."  <u>Id.</u> at 409 (D.N.J. 2000) (citing <u>Walmsley v. City of Philadelphia</u>, 872 F.2d 546, 552 (3d Cir. 1989) (reversing the District Court's directed verdict, as a jury could reasonably conclude that officers were deliberately indifferent to serious medical needs)).  Accordingly, Judge Brotman applied the "deliberate indifference" standard to plaintiff's claims that officers failed to provide him with medical care during his post-arrest detention.  <u>Id.</u>  Judge Brotman specifically questioned this result, noting that as a result, the plaintiff's excessive force claims and medical care claims would be assessed under different standards.  <u>Id.</u>  at 409, n. 27.

[10] In addition, Mrs. Pierce directs the Court outside the Third Circuit, where other Circuit Courts of Appeals have explicitly determined that the Fourth Amendment's ban on unreasonable seizures governs police conduct from the time of arrest until there has been a judicial determination of probable cause.  The Court notes these cases here only to highlight the issues presented by Mrs. Pierce's claims and acknowledge the developments in this jurisprudence in other Circuits.  Specifically, in <u>Sides v. City of Champaign</u>, the Seventh Circuit addressed a plaintiff's claim of inattention to medical needs when police officers made the plaintiff stand in front of a running car in the middle of a hot parking lot during their questioning of the plaintiff. 496 F.3d 820 (7th Cir. 2007).  There, the Seventh Circuit applied the Fourth Amendment's reasonableness inquiry to the plaintiff's claim and explained that the "deliberate indifference"

In arguing her claims under the "objective reasonableness" standard, Mrs. Pierce notes that the application of the Fourth Amendment's "reasonableness" inquiry to this particular type of claim is not unprecedented in this Circuit.  For example, in <u>Davis v. Twp. Of Paulsboro</u>, Judge Irenas applied the Fourth Amendment to an arrestee's claim that an officer unlawfully "cancelled" or "rerouted" an ambulance.  421 F. Supp. 2d 835 (D.N.J. 2006)  There, Judge Irenas found that "[w]hile this claim appears to be a variation of Plaintiffs' delay of medical treatment claims, Officer Ranton's actions took place during Davis' arrest, thus, we apply the Fourth Amendment's reasonableness standard rather than the Fourteenth Amendment deliberate indifference standard applied to pretrial detainees."  <u>Id.</u> at 855 (citing <u>James v. York County Police Dept.</u>, 160 Fed. Appx. 126, 131 (3d Cir. 2005) (finding that the Eighth and Fourteenth Amendment protections inapplicable to Plaintiff's excessive force claim because "[t]he Due Process Clause of the Fourteenth Amendment protects pretrial detainees, those charged with, but not yet convicted of, a crime . . . from the use of excessive force" and Plaintiff

approach "does not apply until a suspect has been convicted" and the "governing standard at the time of arrest is the Fourth Amendment's ban on unreasonable seizures"  <u>Id.</u>  at 828.  <u>See, also</u> <u>e.g.,</u> <u>Ortiz v. City of Chicago</u>, 656 F.3d 523, 530 (7th Cir. 2011) (noting that the Fourth Amendment's reasonableness standard applied to decedent's medical care claims because she "had not yet benefitted from a judicial determination of probable cause"); <u>Williams v. Rodriguez</u>, 509 F.3d 392, 403 (7th Cir. 2007) (discussing how "the Fourteenth Amendment's due process protections only apply to a pretrial detainee's confinement conditions after he has received a judicial determination of probable cause" and "[c]laims regarding conditions of confinement for pretrial detainees . . . who have not yet had a judicial determination of probable cause (a <u>Gerstein</u> hearing), are instead governed by the Fourth Amendment and its objectively unreasonable standard").  Similarly, in <u>Boone v. Spurgess</u>, the Sixth Circuit noted that in the Sixth Circuit, a "seizure" under the Fourth Amendment continues "at least throughout the time the person remains in the custody of the arresting officers" and "there seems to be no logical distinction between excessive force claims and denial of medical care claims when determining the applicability of the Fourth Amendment," as a "seizure can be 'unreasonable' for any number of reasons, and the guarantee of reasonableness in the manner of a seizure does not seem to allow for the distinction between [an excessive force claim and a denial of medical care claim]." <u>Boone v. Spurgess</u>, 385 F.3d 923, 933-34 (6th Cir. 2004).  There, however, the Sixth Circuit declined to conclusively decide the issue, as the Court found that the plaintiff failed to establish a claim under either standard and the Court wished to reserve decision on this issue for a more appropriate case.  <u>Id.</u>  at 934.

"alleged the use of excessive force during the course of his arrest, before he was charged with, or convicted of, a crime.")).  Judge Irenas later applied the "deliberate indifference" standard to the plaintiff's other medical treatment claims, which Mrs. Pierce points out arise from conduct that occurred "after the defendant had been processed and after he had received medical clearance from an emergency room physician."  (Pl.'s Br. Opp'n. 10-11) (citing Davis, 421 F. Supp. 2d at 856-57).

At this juncture, the Court notes the similarities between the claims before Judge Irenas in Davis and Mrs. Pierce's claims presently before the Court.  In essence, Davis concerned law enforcement's decision to re-route an ambulance during the course of Mr. Davis' arrest; similarly, Mrs. Pierce's claims here concern law enforcement's failure to call an ambulance during the course of Mr. Pierce's arrest.  Mrs. Pierce asserts that her "theory of liability is that the Cherry Hill Police, instead of bringing the injured Mr. Pierce for immediate medical attention that she requested on his behalf or summoning medical attention to the scene, handcuffed him and placed him in police custody in the back of a patrol car, handcuffed, for approximately thirty (30) minutes at the scene" (Pl.'s Br. Opp'n. 2.)  Thus, similar to Davis, the medical care claims at issue in this case surround the officers' knowledge and conduct leading up to and during the arrest, as Mrs. Pierce's claims concern the point in time at which the officers should have been aware that Mr. Pierce needed medical attention and then failed to act appropriately. Mrs. Pierce has continuously asserted that the Fourth Amendment inquiry similarly governs her claims and, though not binding on the Court, the Court find Judge Irenas' reasoning persuasive.  This claim and set of facts are appropriately viewed through the prism of the Fourth Amendment's ban of unreasonable seizures, particularly as the claims stem from conduct that concerns the officers' knowledge and actions, or

omissions, leading up to and during Mr. Pierce's arrest, which is historically governed

by the Fourth Amendment.[11]

Mrs. Pierce asserts that questions of fact surround her claims that the officers,

upon learning that Mr. Pierce could be severely injured, should have promptly

summoned medical treatment or should have immediately and properly transported Mr.

Pierce to the hospital and that, in light of the circumstances surrounding the situation,

the officers failed to act in an "objectively reasonable" manner. Mrs. Pierce produced

_____

[11] See Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) (holding that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" and that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims"). Here, the Court briefly notes the similarities between the factual landscape underpinning the Supreme Court's decision to apply the Fourth Amendment to arrest-based "excessive force" claims in Graham and the facts underlying Mrs. Pierce's claims. There, Mr. Graham, a diabetic, "felt the onset of an insulin reaction" and asked his friend to drive him to a nearby convenience store to buy orange juice to counteract the reaction; however, when Mr. Graham entered the store, he saw numerous people in the checkout line and therefore turned around, hurried out of the store, and asked his friend to drive him to another friend's house instead. Id. at 388-90. A police officer saw Mr. Graham "hastily enter and leave the store," became suspicious, and followed their car. Id. The officer made an investigative stop, at which point Mr. Graham's friend told the officer that Mr. Graham "was simply suffering from a 'sugar reaction'" and the officer told them to "wait while he found out what, if anything, had happened at the convenience store" and proceeded to call for backup. Id. In the meantime, Mr. Graham "got out of the car, ran around it twice, and finally sat down on the curb, where he passed out briefly" while his friend pleaded with the officers to get Mr. Graham sugar; instead, an officer "rolled Graham over on the sidewalk and cuffed his hands tightly behind his back, ignoring [his friend's] pleas." Id. In response, another officer said, "I've seen a lot of people with sugar diabetes that never acted like this. Ain't nothing wrong with the M.F. but drunk. Lock the S.B. up." Id. The officers then carried Mr. Graham to his friend's car, placed him face-down on the hood, and ignored his requests that the officers check his wallet for his diabetic decal. Id. Further, when Mr. Graham's friend delivered orange juice to the scene, the officers refused to let Mr. Graham drink it. Id. The officers eventually released Mr. Graham after receiving notice that Mr. Graham did nothing wrong at the convenience store. Id. Though Mrs. Pierce does not bring an "excessive force" claim here, nor does the Court suggest that the officers in this case acted in a violent manner comparable to the officers in Graham, the Court does note the similarities between the medical care issues underlying both cases and the status of both Mr. Graham and Mr. Pierce in relation to the officers, which the Supreme Court determined warranted analysis under the Fourth Amendment. See id. at 395.

several expert reports to support this theory, including a report by a safety and security expert, Andrew Sutor, who opined that "the police had an obligation to Mr. Pierce once they came upon him and found him in the condition reflected in their reports and photos and took him into custody."  (Pl.'s Br. Opp'n., Ex. B, "Sutor Report.")  Specifically, Mr. Sutor's report explains that the officers' training and "specifically the first responder training," informed the officers that "where a person is unable to effectively communicate his or her condition or where there are observations made suggesting a head injury or disorientation or inability to walk, they have an obligation to summon more highly trained EMTs to asses, and, if necessary, treat [] and transport the patient."  (Pl.'s Br. Opp'n., Ex. B, "Sutor Report.")

Mrs. Pierce's "Emergency Medicine Expert," Theodore Tully, similarly opined that the officers had "actual knowledge of Mr. Pierce's condition, yet disregarded same." (Pl.'s Br. Opp'n., Ex. A, "Tully Report.")  Mr. Tully opined that the officers are trained as first responders in a pre-hospital emergency situation and "at no time from 3:25 . . . until 3:55 . . . was Mr. Pierce treated as a patient with concern for a possible serious injury, illness nor providing any degree of first aid by the police . . .."  (Pl.'s Br. Opp'n., Ex. A, "Tully Report.")  Specifically, Mr. Tully's report indicates that the officers are trained "not to delay EMS response or medical evaluation of a patient due to the belief that the patient may be intoxicated" and that they "are trained that the smell of alcohol can divert attention from serious medical problems or injuries."  (Pl.'s Br. Opp'n., Ex. A, "Tully Report.")  Mr. Tully's report also indicates that Mr. Pierce was inappropriately transported, as "a police vehicle is not an appropriate method to transport a patient due to the inability to care for the patient in transport, inability to protect or stabilize

injuries and inability to give treatment that may be life saving to a patient (such as oxygen or medications)."

Mr. Tully's report states that "the delay in activating the EMS response system, the eventual non-treatment of Mr. Pierce and the eventual delayed inappropriate transport of him to the hospital prevented him from surviving a survivable cardiac arrest." (Pl.s' Br. Opp'n., Ex. A, "Tully Report.") Mr. Tully reports that "the officers' failure to take action, given their own observations of Mr. Pierce's condition, deprived Mr. Pierce of the chance of survival." (Pl.s' Br. Opp'n., Ex. A, "Tully Report.") Similarly, as discussed above, when opining on the possible causes of Mr. Pierce's death Dr. Jason concluded that "no matter whether just one of the possible diagnoses or a combination of two or more of them were the cause of death, prompt medical assessment and treatment, given the known history of him having been struck in the head, would have led to a much greater chance of survival." (Pl.'s Br. Opp'n., Ex. C, "Jason Report.")

The Court agrees that Mrs. Pierce's claims call into question what the officers knew or should have known, when they learned that Mr. Pierce needed medical care, and how they acted, or failed to act, throughout the incident, starting from their initial arrival at the diner and interactions with Mr. Pierce, who was then lying on the diner steps. Mrs. Pierce asserts that the officers' actions and omissions violated their training as first responders and that they acted unreasonably in response to Mr. Pierce's condition, which was exhibited by, for example, Mrs. Pierce's allegedly ongoing pleas for medical attention for her husband, the blood in Mr. Pierce's ear, his inability to speak or walk without assistance, and Mr. Pierce's general non-responsiveness. (Pl.'s Br. Opp'n. 14-17.)

The Court is aware that on a motion for summary judgment, it is unable to weigh the evidence or make credibility determinations, rather, the Court's limited role is to determine whether there are issues of material fact for trial.  See Anderson, 477 U.S. at 249.  Accordingly, while the court acknowledges that "police officers are often forced to make split-second judgments [] in circumstances that are tense, uncertain, and rapidly evolving," see Graham, 490 U.S. at 397, Mrs. Pierce has demonstrated sufficient questions of fact surrounding precisely what the officers knew or should have known with regard to Mr. Pierce's need for medical care, when they knew or should have known this information, and, accordingly, whether their failure to provide such care when effectuating Mr. Pierce's arrest was reasonable under the circumstances.  A reasonable jury could find that the officers violated Mr. Pierce's rights under the Fourth Amendment.[12]

Thus, after viewing the record in the light most favorable to the Plaintiff, and finding that a jury could reasonably find that the facts alleged show that the officers' conduct violated a constitutional right[13], the Court will consider whether Mr. Pierce's

---

[12] At this juncture, even applying a heightened "deliberate indifference" standard to Mrs. Pierce's claim, Mrs. Pierce's claim could survive summary judgment.   Similar questions of fact surround whether Mr. Pierce's medical needs were "objectively serious," as Mr. Pierce was very blank and pale, bleeding from his nose and ear, sweating profusely, and he was unable to speak.  While Defendants contend that they are entitled to a grant of summary judgment because the officers do not dispute that they believed Mr. Pierce to be intoxicated, the Court finds that Mrs. Pierce has sufficiently called into question Mr. Pierce's intoxication and the affect it had or should have had on the officers.  Similarly, though by a slimmer margin, questions of fact surround whether the officers acted with "deliberate indifference."  As Defendants note, this is a subjective inquiry, and, viewing all of the facts and reasonable inferences in Mrs. Pierce's favor, including, as Mrs. Pierce points out, the delay of medical treatment and the officers' phone call following Mr. Pierce's death, the Court is unable to find that there are no questions of fact with regard to Defendants' states of mind.

[13] Accordingly, because the Court finds that Mrs. Pierce has demonstrated enough to survive summary judgment on her federal constitutional claims, her analogous state constitutional claims may also survive summary judgment.  See generally, e.g., Joye ex rel. Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 353 N.J. Super. 600, 610, 803 A.2d 706, 713 (N.J. Super. Ct.

rights were "clearly established" at the time of the incident.  See Bayer v. Monroe Cnty.

Children & Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009) (internal citation omitted).

Here, Mrs. Pierce argues that Mr. Pierce's "basic right to care" was clearly established

and "an objective officer in Defendants' position would have recognized that Mr.

Pierce['s] right to medical care was clearly established and that the Defendants violated

that right."  (Pl.'s Br. Opp'n. 22-23.)

Specifically, Mrs. Pierce argues that the right to "prompt medical care while in

custody" was clearly established in 2007.  (Pl.'s Br. Opp'n. 20.)  Mrs. Pierce directs the

Court to Del Tufo v. Twp. of Old Bridge, in which the Supreme Court of New Jersey

noted in 1996:

> It is beyond dispute, and defendants have conceded as much,
> that defendants have a duty to provide emergent medical
> assistance for an arrestee or an inmate in the custody of a
> law enforcement agency.  We find such a duty exists.  Revere
> v. Massachusetts Gen. Hosp., 463 U.S. 239, 103 S.Ct. 2979,
> 77 L.Ed.2d 605 (1983); Estelle v. Gamble, 429 U.S. 97, 97
> S.Ct. 285, 50 L.Ed.2d 251 (1976); Saint Barnabas Medical
> Ctr. v. Essex County, 111 N.J. 67, 74, 543 A.2d 34 (1988).
> "[D]eliberate indifference to serious medical needs of
> prisoners [and arrestees] constitutes the 'unnecessary and
> wanton infliction of pain' proscribed by the Eighth
> Amendment."  Estelle, supra, 429 U.S. at 104, 97 S.Ct. at 291,
> 50 L.Ed.2d at 260 (citations omitted) (quoting Gregg v.
> Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d
> 859, 875 (1976)).

147 N.J. 90, 100-01, 685 A.2d 1267, 1272 (1996).  The New Jersey Supreme Court

further noted that "[t]he police's duty of care to an arrestee requires the exercise of

reasonable care to preserve the life, health, and safety of the person in custody."  Id.

---

App. Div. 2002) aff'd sub nom. Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J.
568, 826 A.2d 624 (2003) (noting that the "[New Jersey] Supreme Court has held that
defendants accused of crime in New Jersey have greater protection under our State
Constitution, N.J. Const. art. I, ¶ 7, than the Fourth Amendment of the Federal Constitution.")

Accordingly, Mrs. Pierce asserts that the law dictating Mr. Pierce's right to medical care under these circumstances was "clearly established" at the time of the incident.

Mrs. Pierce also points to her expert reports that indicate the extent to which the law enforcement officers were trained as first responders, as discussed above. In doing so, Mrs. Pierce asserts that the officers were trained on the proper response to the precise circumstances presented by Mr. Pierce's situation, as Mr. Tully's report indicates that the officers are trained "that the inability to respond, walk and the other conditions they observed of Mr. Pierce require[d] that they summon EMS." (Pl.s' Br. Opp'n., Ex. A, "Tully Report.") Here, Mrs. Pierce asserts that the officers' training on the proper response to Mr. Pierce's condition further indicates the extent to which Mr. Pierce's right to care in his situation was "clearly established." Accordingly, Mrs. Pierce asserts that an objective officer in Defendants position would have recognized his right to medical care.[14]

In light of Mrs. Pierce's arguments here, the Court cannot conclude as a matter of law that Mr. Pierce did not have a "clearly established" constitutional right to medical care during the course of his arrest. Thus, because questions of fact surround Mrs. Pierce's medical care claims and the Court does not find that the Officers are entitled to

---

[14] Defendants contend that the Court's application of the "reasonableness" standard to Mrs. Pierce's claims renders their conduct qualifiedly immune because they anticipated that the Court would apply the "deliberate indifference" standard to their conduct. Here, however, a court's inquiry into the existence of an individual's "clearly established" right appears to be a different inquiry than the post-hoc analysis employed when assessing whether the right was violated. Regardless, courts have traditionally applied the Fourth Amendment's "objective reasonableness" inquiry to claims arising during the course of an individual's arrest. See, e.g., Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

summary judgment on the basis of qualified immunity, Defendants' motion for summary judgment on Plaintiff's claims under Section 1983 is denied.[15]


## Immunity under the New Jersey Tort Claims Act

Defendants seek summary judgment on Mrs. Pierce's state law tort claims on the basis of "good faith" immunity. Specifically, Defendants assert that they are entitled to "good faith immunity" under Section 59:3-3 of the New Jersey Tort Claims Act, which provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law."[16]

At the outset, Mrs. Pierce asserts that the defendants failed to point to a "law" that they were executing or enforcing when failing to provide medical care to Mr. Pierce. (Pl.'s Br. Opp'n. 29.) Here, Mrs. Pierce urges the Court to follow Del Tufo v. Twp. of Old Bridge, which similarly addressed a plaintiff's claims of police failure to provide medical

---

[15] The parties assert the same arguments regarding qualified immunity as to their state constitutional claims brought under the New Jersey Civil Rights Act claims based on Ramos v. Flowers, in which the Superior Court of New Jersey, Appellate Division, found that the "[New Jersey] Legislature anticipated that New Jersey courts would apply the well-established law concerning the affirmative defense of qualified immunity in adjudicating damage claims under the [New Jersey Civil Rights] Act." Ramos v. Flowers, 429 N.J. Super. 13, 24, 56 A.3d 869, 876 (N.J. Super. Ct. App. Div. 2012). Accordingly, for the same reasons described above, the Court finds that it cannot enter summary judgment in favor of the Defendants based on qualified immunity for Plaintiff's state constitutional claims under the New Jersey Civil Rights Act.

[16] Defendants point out that "good faith immunity" under this Section has two alternate parts: a public employee may establish that his or her conduct was "objectively reasonable" or that he or she acted with "subjective good faith." See, e.g., Alston v. City of Camden, 168 N.J. 170, 186, 773 A.2d 693, 703 (N.J. 2001) (noting that a "public employee either must demonstrate 'objective reasonableness' or that he behaved with 'subjective good faith' and that a "public employee need prove only one component"). For the same reasons described in the Court's analysis of the Defendants entitlement to qualified immunity under the federal and state constitutional claims, because the Court finds that questions of fact surround the "objective reasonableness" of their conduct under clearly established law, the Court cannot grant Defendants' motion for summary judgment on this alternate ground for good faith immunity.

assistance to an arrestee.  <u>Del Tufo v. Twp. of Old Bridge</u>, 278 N.J. Super. 312, 326, 650

A.2d 1044, 1051 (N.J. App. Div. 1995) <u>aff'd</u>, 147 N.J. 90, 685 A.2d 1267 (N.J. 1996).

There, the New Jersey Superior Court found that the "immunity for enforcing and

executing the law does not protect defendants" because the plaintiff did not assert "that

the defendants should not have executed or enforced the law" and that the officers'

"duty to execute or enforce the law did not preclude them from providing emergency

medical assistance to their arrestee" in that case.  <u>Del Tufo v. Twp. of Old Bridge</u>, 278

N.J. Super. 312, 326, 650 A.2d 1044, 1051 (App. Div. 1995) <u>aff'd</u>, 147 N.J. 90, 685 A.2d

1267 (1996).

Defendants contend that if "arresting and incarcerating a person who is

suspected of stabbing another person is not the enforcement of any law, then the result

would be absurd" and that general rules of statutory construction seek to avoid

"unreasonable or absurd results."  (Defs.' Reply) (citing <u>In re Johnny Popper, Inc.</u>, 413

N.J. Super. 580, 589, 997 A.2d 257, 262 (N.J. Super. Ct. App. Div. 2010) ("discussing

canon of statutory construction to avoid unreasonable result").  Accordingly, Defendants

assert that Section 59:3-3 is applicable and that they are entitled to summary judgment

based on their "subjective good faith."  (Defs.' Br. Summ. J. 23-24.)  Specifically,

Defendants contend that the summary judgment record evidences their "care for Mr.

Pierce's well-being despite being suspected of attempted homicide" and that the officers

"are un-contradicted in their testimony that they believed Mr. Pierce was intoxicated"

and wanted Mr. Pierce to be medically cleared before sending him to Camden County.

(Defs.' Br. Summ. J. 24.)

Even assuming that Section 59:3-3 is applicable to Defendants' conduct, as they

assert, when viewing the facts and drawing all reasonable inferences in Plaintiff's favor,

the Court cannot reject Plaintiff's argument that questions of fact surround the officers' states of mind. Here, Mrs. Pierce argues that after knowing that Mr. Pierce had been involved in a fight, that he was non-responsive and unable to communicate, and "instead of following their training and summoning an EMT when they recognized that the prone Mr. Pierce could not speak or move on his own after having been involved in a Code 2 fight" they told "Mrs. Pierce to 'sit down and shut up' and put [Mr. Pierce] in the police cruiser." (Pl.'s Br. Opp'n. 31-32.) Plaintiff asserts that "[a] jury could find that Defendants' actions were not taken in objective or subjective good faith." (Pl.'s Br. Opp'n. 32.) Accordingly, viewing the facts and drawing all reasonable inferences in Plaintiff's favor, the Court is unable to grant Defendants' motion on immunity grounds.

### Negligent Infliction of Emotional Distress

Defendants also move for summary judgment on Mrs. Pierce's claim for negligent infliction of emotional distress ("NIED"). In New Jersey, a plaintiff can maintain a cause of action for NIED where:

> (1) the defendant's negligence caused the death of, or serious physical injury to, another; (2) the plaintiff shared a marital or intimate, familial relationship with the injured person; (3) the plaintiff had a sensory and contemporaneous observation of the death or injury at the scene of the accident; and (4) the plaintiff suffered severe emotional distress.

Jablonowska v. Suther, 195 N.J. 91, 103-04, 948 A.2d 610, 617-18 (N.J. 2008) (citing Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (N.J. 1980)).

Defendants assert that they are entitled to summary judgment on Mrs. Pierce's NIED claim because she cannot satisfy the "contemporaneous observation"

requirement.[17]  (Defs.' Reply.)  Defendants contend that Mrs. Pierce's NIED claim is distinguishable from that in <u>Ortiz v. John D. Pittenger Builder, Inc.</u>, where the Superior Court of New Jersey expanded the "observation" prong "to include being 'sensorially aware' of a family member who is within a burning building" and found that the plaintiffs' claims could survive summary judgment because "plaintiffs sensorially experienced the burning death of their five-year-old relative."  382 N.J. Super. 552, 563, 566, 889 A.2d 1135, 1142, 1144 (N.J. Super. 2004).  Defendants contend that the present case is distinguishable from <u>Ortiz</u> because there, "both plaintiffs had been in the house when the fire started and the grandmother was severely burned trying to find the child." (Defs.' Reply.)  Defendants argue that here, in contrast, "no member of the Pierce family was present when Mr. Pierce suffered his heart attack" (Defs.' Br. Summ. J. 25) and that Mrs. Pierce "only learned about it when informed by Sgt. Henderson."  (Defs.' Reply.)

In response, Mrs. Pierce argues that she only needs to demonstrate that she witnessed "an accident resulting in the wrongful death or grievous bodily injury of a person with whom one shares an intimate familial relationship."  (Pl.'s Br. Opp'n. 33) (quoting <u>Dunphy v. Gregor</u>, 136 N.J. 99, 115, 642 A.2d 372, 380 (N.J. 1994)).  As such, she contends that she "viewed Mr. Pierce lying on the concrete steps injured, knowing he was non-responsive, bleeding, and in her opinion (subsequently proven correct) needing medical care."  (Pl.'s Br. Opp'n. 33.)  Mrs. Pierce's theory is that she "knew her husband had been seriously injured, she asked the officers for help, and they refused, instead telling her to sit down on the curb and shut up."  (Pl.'s Br. Opp'n. 33.)  Thus, Mrs. Pierce asserts that she meets the NIED framework, as she "witnessed the tortious

---

[17] For the purposes of the motion, Defendants conceded that Mrs. Pierce "suffered severe emotional distress after learning of her husband's death."  (Defs.' Reply.)

events (the refusal to provide medical attention) that resulted in her husbands death."
(Pl.'s Br. Opp'n. 34.)

Here, viewing the facts most favorable to Mrs. Pierce, the Court cannot conclude as a matter of law that Mrs. Pierce did not experience a "sensory, contemporaneous perception of a severe injury to a spouse or close family member caused by the defendant's negligent conduct." See Jablonowska, 948 A.2d at 620-23. On a motion for summary judgment, the Court is unable to weigh evidence or make credibility determinations. See, e.g., Big Apple BMW, Inc., 974 F.2d at 1363. As such, the Court does not find as a matter of law that, the officers' failure to provide medical care, which Mrs. Pierce asserts that she contemporaneously observed as she protested and pleaded with the police to get medical attention for her husband, was not an "injury-producing event" similar to the fire in Ortiz. Rather, questions of fact surround the precise contours of the scenario at the diner and Mrs. Pierce's perception thereof. Accordingly, the Court will deny defendants' motion for summary judgment on this claim.

## Conclusion

For the reasons stated above, as well as those stated on the record during the hearing on April 11, 2013, Defendants' motion for summary judgment is denied.

An appropriate Order shall issue.

Dated: June 26, 2013

s/ Joseph H. Rodriguez
_____
Hon. Joseph H. Rodriguez,
United States District Judge